# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

JENNIFER KEETON,

       Plaintiff,

   v.

MARY JANE ANDERSON-WILEY, Associate Professor, Augusta State University; PAULETTE SCHENCK, Assistant Professor; RICHARD DEANER, Assistant Professor; WAYNE LORD, Chairman of Department of Educational Leadership, Counseling, and Special Education; GORDON EISENMAN, Dean of the College of Education; WILLIAM A. BLOODWORTH, JR., President of Augusta State University; ROBERT F. HATCHER, Chairman of the Board of Regents of the University System of Georgia; WILLIS J. POTTS, JR., Vice-Chairman of the Board of Regents; and KENNETH R. BERNARD, JR., JAMES A. BISHOP, FREDERICK E. COOPER, LARRY R. ELLIS, C. THOMAS HOPKINS, JR., FELTON JENKINS, W. MANSFIELD JENNINGS, JR., JAMES R. JOLLY, DONALD M. LEEBERN, JR., WILLIAM H. NESMITH, JR., DOREEN STILES POITEVINT, WANDA YANCEY RODWELL, KESSEL STELLING, JR., BENJAMIN J. TARBUTTON, III, RICHARD L. TUCKER, and LARRY WALKER, Members of the Board of Regents,

       Defendants.

CIVIL ACTION NO. _____

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

INTRODUCTION ............................................................................................................. 1

FACTUAL SUMMARY ...................................................................................................... 3

ARGUMENT ................................................................................................................... 8

    I.  MISS KEETON IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS. ..................... 8

        A.  DEFENDANTS ARE VIOLATING MISS KEETON'S FIRST AMENDMENT RIGHTS BY
            DISCRIMINATING AGAINST HER BASED ON THE VIEWPOINT OF HER SPEECH. ............ 9

        B.  DEFENDANTS ARE VIOLATING MISS KEETON'S ABSOLUTE FIRST AMENDMENT
            RIGHT TO BELIEVE AND PROFESS THE BELIEFS OF HER CHOICE. .............................. 13

        C.  DEFENDANTS ARE VIOLATING THE FIRST AMENDMENT COMPELLED
            SPEECH DOCTRINE. ......................................................................................... 16

        D.  DEFENDANTS ARE RETALIATING AGAINST MISS KEETON FOR EXERCISING HER
            FIRST AMENDMENT RIGHTS. ............................................................................. 18

            1.  MISS KEETON ENGAGED IN PROTECTED EXPRESSION. .................................. 18

            2.  DEFENDANTS TOOK ADVERSE ACTION AGAINST MISS KEETON. ....................... 19

            3.  DEFENDANTS' ADVERSE ACTIONS WERE SUBSTANTIALLY MOTIVATED BY
               MISS KEETON'S PROTECTED EXPRESSION. ................................................... 20

    II.  MISS KEETON IS SUFFERING IRREPARABLE INJURY. ...................................... 21

    III. THE REQUESTED INJUNCTION WILL NOT HARM DEFENDANTS. ................................. 22

    IV. THE REQUESTED INJUNCTION WILL NOT BE ADVERSE TO THE PUBLIC INTEREST. ... 22

CONCLUSION ............................................................................................................... 22

## INTRODUCTION

Amidst the constant, contentious public debate over matters of religion and sexual morality, Augusta State University officials crossed a dangerous line. Rather than honoring the constitutionally-mandated marketplace-of-ideas character of the university, these state officials decided not only that they know the correct answer (indeed, the only answer) to one of the more contentious moral issues of our day, but that they can deny a university degree, and thus the ability to enter a profession, to a student who dares to disagree with their government-backed moral position. The Constitution prohibits the government from acting as the arbiter of citizens' moral beliefs, from barring citizens from their chosen profession due to their beliefs, and from compelling citizens to articulate the government's preferred viewpoints.

By threatening to expel Miss Keeton from the Augusta State University ("ASU") Counselor Education Program, Defendants strike at the very "heart of the First Amendment," "the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Accordingly, the First Amendment prohibits government from "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), from "compel[ling] affirmance of a belief with which [a] speaker disagrees," *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995), and from "target[ing] . . . particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Yet Defendants subjected Miss Keeton to a remediation plan merely because she "voiced disagreement in several class discussions and in written assignments," discussed disfavored ideas with fellow students, and sought to persuade students of her Christian beliefs. (Compl. ¶¶ 29–30, 16–17.) And Defendants have mandated that she undergo a sustained program of proselytizing

that is overtly hostile to her Christian convictions and aimed at forcing her to "alter her beliefs." (*Id.* ¶¶ 1, 51, 53.) Only if Miss Keeton "converts" will she be deemed worthy by Defendants to continue as a student in the ASU counseling program. In short, having been provoked to action by Miss Keeton's disfavored speech, Defendants now seek to compel her to commit herself henceforth to a new set of ASU-approved convictions.

Defendants' actions are particularly egregious for they occur at a public university, which is the "marketplace of ideas," *Healy v. James*, 408 U.S. 169, 180 (1972), and a "vital center[] for the Nation's intellectual life," *Rosenberger*, 515 U.S. at 836. Given the need for "vigilant protection of constitutional freedoms" in this context, *Healy*, 408 U.S. at 180 (*quoting Shelton v. Tucker*, 364 U.S. 479, 487 (1960)), "universities are not enclaves immune from the sweep of the First Amendment." *Id.*[1] Indeed, "[t]he essentiality of freedom in the community of American universities is almost self-evident. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

Yet in an arena of "social sciences, where few, if any, principles can be accepted as absolutes," *id.*, Defendants not only announced a set of non-negotiable moral positions, they also compelled Miss Keeton to believe and affirm her allegiance to these government-adopted absolutes. Hence, they have imposed the prohibited "pall of orthodoxy over the classroom" (and indeed, the entire campus), *id.*, violated that "fixed star in our constitutional constellation," *Barnette*, 319 U.S. at 642, and "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control." *Id.*

---

[1] *See also Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 671 (1973) ("[T]he First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech. . . .").

## Factual Summary[2]

In the fall of 2009, Miss Jennifer Keeton enrolled in ASU's Counselor Education Program, seeking to obtain her master's degree in school counseling so that she could encourage and assist young students. (Compl. ¶¶ 13–15.) These professional goals flowed directly from her Christian faith, which also undergirds her beliefs regarding human nature, the purpose and meaning of life, and the ethical standards that govern human conduct. (*Id.* ¶ 14.)

At certain points during the school year, Miss Keeton discussed her religiously-based views of gender and sexuality in class discussions and written assignments. That is, she explained her beliefs that sexual behavior is the result of personal choice for which individuals are accountable, not inevitable deterministic forces; that gender is fixed and binary (*i.e.*, male or female), not a social construct or personal choice subject to individual change; and that homosexuality is a "lifestyle," not a "state of being." (*Id.* ¶ 16.) Outside the classroom, Miss Keeton shared her Christian faith with certain friends and colleagues, commended its virtues and benefits, and explained Christian viewpoints on matters related to sexual ethics.[3] (*Id.* ¶ 17.)

In May 2010, Defendant Anderson-Wiley informed Miss Keeton that she would have to complete a remediation plan to be discussed at a May 27th meeting. (*Id.* ¶ 23.) According to the Counseling Education Program handbook, these "remediation plans" address students whose performance is "not satisfactory on interpersonal or professional criteria unrelated to academic performance" and outline what a student must do "to be removed from remediation status."[4] (*Id.* ¶¶

---

[2]    Due to the Court's limitations on brief length (L.R. 7.1(a)), this factual summary merely highlights some of the key facts, but by this reference incorporates all the facts presented in Miss Keeton's Verified Complaint.

[3]    Consistent with her biblical convictions, Miss Keeton has never questioned the dignity or worth of individuals because of their moral views or sexual behavior as neither undermines their valuable status as created in the image of God. (Compl. ¶ 18.)

[4]    Curiously, Defendants included an academic concern—Miss Keeton's writing skills—in this remediation plan that must be "unrelated to academic performance." (Compl. ¶¶ 24, 28, 21.)

21–22.)  But the only non-academic reason for this remediation plan was the beliefs she had expressed—in and out of class—regarding "GLBT" (Gay, Lesbian, Bisexual, and Transgender) issues.  (*Id.* ¶¶ 25, 37.)  At the May 27th meeting, Miss Keeton received a copy of the Remediation Plan which questions "[her] ability to be a multiculturally competent counselor" because she had "voiced disagreement . . . with the gay and lesbian 'lifestyle'" in a class.  (*Id.* ¶ 29.)  It highlights "unsolicited reports" from a fellow student that she had discussed "conversion therapy for GLBTQ populations"[5] and—worse yet—"tried to convince other students to support and <u>believe</u> her views." (*Id.* ¶ 30 (emphasis original).)  The Remediation Plan opines that her speech violated various codes of ethics and departed from "psychological research" (*i.e.*, that "sexual orientation is not a lifestyle or a choice, but a <u>state of being</u>").  (*Id.* ¶¶ 31–33 (emphasis original).)  And it prescribed a litany of workshops, readings, activities (including "attending the Gay Pride Parade in Augusta"), papers, and reflections designed to counter, undermine, and change her convictions.  (*Id.* ¶¶ 34–36.)

In the May 27th meeting, the Defendant professors focused almost entirely on Miss Keeton's views of gender and homosexual behavior.  (*Id.* ¶ 38.)  Defendant Schenck recalled making a note to herself to follow up with Miss Keeton after she once expressed her moral views in class.  (*Id.* ¶ 39.)  Dr. Anderson-Wiley interrogated Miss Keeton on biblical teachings, complained that "Christians see this population as sinners," and demanded that Miss Keeton choose between her religious beliefs and the ACA Code of Ethics.  (*Id.* ¶¶ 43–46.)  After Miss Keeton had communicated her fidelity to Scriptural precepts, Dr. Schenck exclaimed, "You couldn't be a teacher, let alone a counselor, with those views."  (*Id.* ¶¶ 47–48.)  Dr. Anderson-Wiley explained that the faculty were asking her to "alter some of her beliefs."  (*Id.* ¶ 51.)  As Miss Keeton resisted her professors' pressure to sign the Remediation Plan (requesting time to review it more carefully), they set a second meeting for June 10th.  (*Id.* ¶¶ 53–56.)

---

[5]      Miss Keeton denied this report and questioned its relevance to her status at ASU.  (Compl. ¶¶ 40–42.)

Miss Keeton explained at the June 10th meeting that she would sign the Remediation Plan because she had determined that she could both maintain her biblical beliefs and affirm the dignity of her clients.  (*Id.* ¶¶ 61–63.)  Dr. Schenck responded by questioning her motives, observing that it appeared that Miss Keeton was agreeing to participate in the Remediation Plan in order to stay in the ASU counseling program, not because she was committed to reconsidering her views on GLBT matters.  (*Id.* ¶ 64.)  Stating that Miss Keeton's biblical views could harm her clients, Dr. Anderson-Wiley reiterated how she would have to alter those beliefs.[6]  (*Id.* ¶ 65.)  Nor would a superficial change suffice; it had to be a fundamental one.  (*Id.* ¶¶ 66–71.)  Her professors emphasized that Miss Keeton could not believe that others should share her moral views or that homosexuals should change their conduct if she aims to complete the Remediation Plan successfully.  (*Id.* ¶ 71.)  The professors reminded Miss Keeton that their concerns arose from her comments in and out of the classroom.  (*Id.* ¶ 72.)

After signing the Remediation Plan (*id.* ¶ 75), Miss Keeton e-mailed Defendants on June 14th to retract her agreement to participate in remediation, considering the faculty's requirement that she change her views.  She emphasized that "[her] Christian moral views are not just about [her]" but "show[] the right way to live" for "all people" and that "[her] biblical views won't change."  (*Id.* ¶ 76.)  Among the several e-mails that followed, the message from Dr. Schenck focused on the faculty's core concern:

> Jennifer, you misinterpreted what I was saying.  I do not expect you to change your personal beliefs and values.  *What is the issue is if you believe your personal beliefs and values should be the same beliefs and values for all people.*  This is the unethical part—applying your own personal beliefs and values on other people and not truly accepting that others can have different beliefs and values that are equally valid as your own.

(*Id.* ¶ 78 (emphasis added).)  Ultimately, they called a third remediation plan meeting.  (*Id.* ¶ 81.)

---

[6]      Indeed, Dr. Anderson-Wiley openly wondered where Miss Keeton had gotten the notion that she could complete the remediation program and maintain her biblical convictions.  (Compl. ¶ 67.)

At this third meeting on June 22nd, Defendants presented Miss Keeton with an addendum to the Remediation Plan. (*Id.* ¶¶ 82–83.) It reiterated how Miss Keeton's in-class comments, papers, interactions with other students, and even her e-mails to Defendants motivated the faculty's pursuit of Miss Keeton's remediation. (*Id.* ¶ 84; *see also id.* ¶ 97.) It echoed Dr. Schenck's claim that Miss Keeton's belief that others should follow biblical moral values is unethical:

> These statements indicate that you *think* certain people should act in accordance with your moral values, and/or that your beliefs are in some way superior to those of others. *The belief* that you possess a special knowledge about the way that other people should live their lives, and that others need to adopt a similar set of values contradicts the core principles of the American Counseling Association and American School Counselor Association Codes of Ethics, which define the roles and responsibilities of professional counselors.

(Compl. Ex. C at 1 (emphasis added); *see also* Compl. ¶¶ 85–86.) It noted that Miss Keeton must "recognize[e] that the client's values should always be upheld, not questioned or altered" (Compl. ¶ 87), something Drs. Schenck and Deaner underscored orally (*id.* ¶¶ 89–90, 96). And it concluded by saying: "Should you choose not to complete the plan, you will be dismissed from the counseling program." (Compl. Ex. C at 2; Compl. ¶ 88.)

After trying to correct her professors' mischaracterization of her beliefs and questioning the basis for the Remediation Plan (Compl. ¶¶ 91–95), Miss Keeton pointed out how the Remediation Plan targeted her beliefs (*id.* ¶ 98), she assured her professors that she would not impose her beliefs on clients (*id.* ¶ 99), but noted that she could not affirm homosexual conduct (*id.* ¶ 100). Drs. Schenck and Deaner responded by insisting that affirming a client's sexual choices is a "life and death matter" with the suicide of clients the potential result of Miss Keeton's position. (*Id.* ¶ 101.) Feeling manipulated by the entire process, including such dire predictions, Miss Keeton agreed to comply with the Remediation Plan, despite continuing discomfort at how her professors were trying to force her to change her religiously-based beliefs. (*Id.* ¶¶ 102–03.)

6

Dr. Anderson-Wiley confirmed that Miss Keeton could not complete the Remediation Plan or the counseling program without committing to affirm the propriety of homosexual relations, a requirement Dr. Anderson-Wiley also included in her written summary of the meeting. (*Id.* ¶¶ 104–07.)

Days later, Miss Keeton responded to Defendants' coercion. On June 26th, she e-mailed Drs. Anderson-Wiley, Schenck, and Deaner:

> The last few days I have again been doing a lot of reflecting. I have been reading through the papers you gave me at the meeting on Tuesday and thinking about all that was said there.
>
> I had written to you before the meeting and said at the beginning of our meeting that I did not want to go forward with the second part of the remediation plan. I felt pressured into agreeing to the plan by the end of the meeting. But I am not willing to go through with that because I know what it will require from me.
>
> At times you said that I must alter my beliefs because they are unethical. Other times you said that I can keep my beliefs so long as they are only personal and I don't believe that anyone else should believe like me. But that is just another way of saying that I must alter my beliefs, because my beliefs are about absolute truth. I understand the need to reflect clients' goals and to allow them to work toward their own solutions, and I know I can do that.
>
> I know there is often a difference between personal beliefs and how a counseling situation should be handled. But in order to finish the counseling program you are requiring me to alter my objective beliefs and also to commit now that if I ever may have a client who wants me to affirm their decision to have an abortion or engage in gay, lesbian, or transgender behavior, I will do that. I can't alter my biblical beliefs, and I will not affirm the morality of those behaviors in a counseling situation.
>
> I don't want any more meetings. My final answer is that I am not going to agree to a remediation plan that I already know I won't be able to successfully complete.
>
> Jen

(*Id.* ¶ 108.) In short, Miss Keeton declines to complete the second portion of the Remediation Plan; she will not change her beliefs regarding objective, universal moral truth or affirm behaviors the Bible deems immoral. Defendants have repeatedly explained this will result in their

dismissing Miss Keeton from the counseling program.  (*Id.* ¶ 110.)

Indeed, this ever-present threat has also chilled Miss Keeton's speech, both in and out of academic settings at ASU.  (*Id.* ¶ 111.)  During a recent summer session psychology class, Miss Keeton's professor presented material on human sexuality and gender that conflicted with her biblical moral views.  But considering the unfavorable attention and consequences that Defendants directed to her for raising a differing perspective on such matters, Miss Keeton refrained from expressing any disagreement with the professor's statements, a textbook example of self-censorship.  (*Id.* ¶ 112.)

In sum, Miss Keeton's speech continues to be chilled as she operates under the constant fear of dismissal.  Given her definitive written statement e-mailed to the faculty on June 26th, she expects to be dismissed from the ASU counseling program at any time and assumes the semester break may be responsible for that action having not yet been taken against her.

<u>ARGUMENT</u>

Miss Keeton is entitled to a preliminary injunction because:  "(1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [her] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

I.   MISS KEETON IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

Defendants have disregarded clear constitutional prohibitions in their treatment of Miss Keeton.  Accordingly, she is substantially likely to succeed on the merits of her claims briefed here,[7] and her request for preliminary injunctive relief should be granted.

---

[7]   Plaintiff has not briefed all of her claims for injunctive relief, or all the legal bases for the relief she does request herein, due to her interest in filing expeditiously to obtain relief on the most pressing of

## A. DEFENDANTS ARE VIOLATING MISS KEETON'S FIRST AMENDMENT RIGHTS BY DISCRIMINATING AGAINST HER BASED ON THE VIEWPOINT OF HER SPEECH.

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004); *accord Rosenberger*, 515 U.S. at 829.[8] Viewpoint discrimination occurs when "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. Thus, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* These principles apply regardless of the speech or forum because "[g]overnment actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place." *Holloman*, 370 F.3d at 1280.

Defendants unquestionably disciplined Miss Keeton based on her viewpoint, as proven by the Remediation Plan itself. Indeed, Defendants initiated their month-long, nonacademic remediation program against her precisely because she "voiced disagreement . . . with the gay and lesbian 'lifestyle'" in class and "she has tried to convince other students to support and believe her views" outside the classroom. (Compl. ¶¶ 21, 29–30.) After brazenly admitting that her views were the target, Defendants imposed the Remediation Plan to "correct" these views. They first opined that Miss Keeton's views violate various codes of ethics for the counseling profession. (*Id.* ¶ 31.) They contend that her views depart from the "the psychological research about GLBTQ populations," *viz.*, that "sexual orientation is not a lifestyle or choice, but a state of being." (*Id.* ¶ 32.) And they state their opinion that attempts to change one's asserted sexual

---

her concerns:  avoiding expulsion from the ASU counseling program, and avoiding being subject to the Remediation Plan while a student in the program.

[8]      *See also Turner Broad.*, 512 U.S. at 641 ("Government action that stifles speech on account of its message . . . contravenes this essential right" and "rais[es] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace" (internal citations & quotations omitted)).

orientation may be harmful.  (*Id.* ¶ 33.)

After presenting these biased assertions, the Remediation Plan requires Miss Keeton to submit to pro-GLBTQ proselytization to remedy her alleged lack of "multicultural competence." (*Id.* ¶¶ 29, 34.)  On pain of dismissal, Miss Keeton must:  (1) attend three pro-GLBTQ workshops; (2) read ten pro-GLBTQ peer reviewed articles; (3) review the pro-GLBTQ counseling competencies of the Association for Lesbian, Gay, Bisexual, and Transgender Issues in Counseling ("ALGBTIC"); and—for good measure—(4) interact more with the homosexual community (with the suggestion that she attend the local Gay Pride Parade).  (*Id.* ¶¶ 34–35.)  Furthermore, Miss Keeton's successful completion of the remediation program hinges upon what she says in her monthly "reflection" papers about how exposure to these pro-GLBTQ sources have "influenced her beliefs."  (*Id.* ¶ 34.)  Such a lopsided plan is the antithesis of viewpoint-neutrality.

Defendants confirm their viewpoint-based motivation by their actions and comments during the remediation process itself, which openly target her "beliefs" and "views."  In the first remediation meeting, Dr. Anderson-Wiley examined Miss Keeton on the biblical basis of her views.  (*Id.* ¶ 43.)  When Miss Keeton briefly explained part of the Bible's perspective, Dr. Anderson-Wiley marginalized her position and noted, "Christians see this population as sinners." (*Id.* ¶¶ 43–45.)  She then insisted that Miss Keeton choose between standing by either the Bible or the ACA Code of Ethics.  (*Id.* ¶ 46.)  Dr. Schenck told Miss Keeton she "couldn't be a teacher, let alone a counselor, with [her] views."  (*Id.* ¶¶ 47–48.)  Defendants also labeled her "prejudiced" and recommended that she consider leaving ASU to attend a Christian counseling program.  (*Id.* ¶¶ 49, 52.)  They told her she needs to alter her beliefs on homosexual behavior and then pressured her to sign the Remediation Plan.  (*Id.* ¶¶ 51–56.)

At the second remediation meeting, Defendants rejected Miss Keeton's assertion that she

could simultaneously maintain her biblical views and fulfill the Remediation Plan.  (*Id.* ¶¶ 63–64.)  Dr. Schenck explained that their objective was a fundamental change in her outlook, requiring her to alter her objective convictions on sexual morality.  (*Id.* ¶¶ 66, 71.)  They further opined that her views could be harmful to future clients.  (*Id.* ¶ 65.)  And they strongly urged her to attend the Gay Pride Parade, get involved with GLBTQ-affirming student groups, and read additional material by pro-GLBTQ groups.  (*Id.* ¶ 74.)  Pressured by her superiors, Miss Keeton signed the Remediation Plan.  (*Id.* ¶ 75.)

But when Miss Keeton later explained by email that she could affirm the dignity of all future clients and that her "biblical views won't change," her professors immediately scheduled another remediation meeting to assure compliance.  (*Id.* ¶¶ 76–81.)  Dr. Schenck's email response highlighted Miss Keeton's beliefs as the faculty's core concern:

> Jennifer, you misinterpreted what I was saying.  I do not expect you to change your personal beliefs and values.  *What is the issue is if you believe your personal beliefs and values should be the same beliefs and values for all people.  This is the unethical part*—applying your own personal beliefs and values on other people and not truly accepting that others can have different beliefs and values that are equally valid as your own.

(*Id.* ¶ 78 (emphasis added).)  Which is to say, Miss Keeton's beliefs are unacceptable.

Her professors repeated this sentiment in the Addendum they read to Miss Keeton at the third remediation meeting, in which they stated that her emails explaining the objective and universal nature of her ethical views was the fundamental problem (*id.* ¶¶ 83–84):

> These statements indicate that you *think* certain people should act in accordance with your moral values, and/or that your *beliefs* are in some way to superior to those of others.  The *belief* that you possess a special knowledge about the way that other people should live their lives, and that others need to adopt a similar set of values contradicts the core principles of the American Counseling Association and American School Counselor Association Codes of Ethics, which define the roles and responsibilities of professional counselors.

(Compl. Ex. C at 1 (emphasis added).)  Her professors again challenged Miss Keeton's beliefs on

11

homosexual conduct, and insisted that such beliefs could harm—and even lead to the deaths of—future clients.  (Compl. ¶¶ 100–01.)  They asserted that she must not impose her values on clients—even by judging a client's behavior immoral.  (*Id.* ¶¶ 95–96, 104.)  Dr. Anderson-Wiley then summed up the meeting—and indeed the entire remediation process—by emphasizing that Miss Keeton would not be able to complete successfully the Remediation Plan or the ASU counseling program if she would not commit to affirm the propriety of gay and lesbian relationships if her future professional efforts presented such an opportunity.  (*Id.* ¶¶ 104–07.)  Then Miss Keeton again agreed under duress to the Remediation Plan, and she and the faculty initialed a handwritten summary of the meeting:

> Right now, Jen cannot affirm and attend to relationship issues of gay and lesbian persons, but she recognizes that through the remediation plan she may further learn to separate personal values and beliefs from those of the client so that she may attend to <u>any</u> need of future clients in an ethical manner.

(*Id.* ¶ 106.)

Defendants' repeatedly invoked Miss Keeton's "beliefs" and "views," demonstrating that the "perspective of [Miss Keeton] is the rationale" for their actions.  *Rosenberger*, 515 U.S. at 829.  Furthermore, the hypothetical component of their remediation arguments highlights Defendants' discriminatory motives.  Defendants subjected Miss Keeton to a sustained disciplinary program because of what they think she *might* say in a counseling situation in the *future*—one that Miss Keeton may never face.  The First Amendment prohibits this naked attempt by state officials to "correct" Miss Keeton's views.

The remediation process from start to finish points to only one conclusion:  Defendants discriminated against Miss Keeton because of the religious beliefs she holds and the views she expressed regarding gender and sexual morality.  They targeted her expression of her views when they initiated their disciplinary process, formulated the Remediation Plan, verbally cen-

sured her, and threatened to expel her from the counseling program. A clearer example of viewpoint discrimination is difficult to conceive.

If there be any remaining doubt that school officials cannot penalize viewpoints in this manner, the Eleventh Circuit puts them to rest. *See Holloman*, 370 F.3d at 1268–69; *Gay Lesbian Bisexual Alliance (GLBA) v. Pryor*, 110 F.3d 1543, 1549–50 (11th Cir. 1997). In *Holloman*, a public school disciplined a student for silently raising his fist during the Pledge of Allegiance. The Eleventh Circuit reversed summary judgment for the school officials, holding that those officials' comments supporting the Pledge and devaluing the plaintiff's opposite perspective, plus their threat of reprisal if the plaintiff did not capitulate, "virtually compel[led] the conclusion" that the plaintiff was punished for his viewpoint. *Holloman*, 370 F.3d at 1281–82. In Miss Keeton's case, Defendants' repeated statements of opposition to her objective moral views, and their threats to dismiss her from her degree program if she did not change them, similarly compel the conclusion that forbidden viewpoint discrimination is being employed.

The Eleventh Circuit elsewhere held that university officials transgressed the First Amendment when they denied funding to a homosexual student group based on the assumption that the group "foster[ed] or promote[d] a lifestyle or actions prohibited by [Alabama's] sodomy and sexual misconduct laws." *GLBA*, 110 F.3d at 1548. Because groups that promoted lifestyles in "compliance" with such laws could receive funding, the Court found "blatant viewpoint discrimination" in the university's denial of funding. *Id*. at 1549. The same constitutional principle applies here. The First Amendment precludes Defendants from penalizing Miss Keeton for her speech because it does not communicate their preferred outlook.

### B. DEFENDANTS ARE VIOLATING MISS KEETON'S ABSOLUTE FIRST AMENDMENT RIGHT TO BELIEVE AND PROFESS THE BELIEFS OF HER CHOICE.

Because "[t]he free exercise of religion means, first and foremost, the right to *believe and*

*profess* whatever religious doctrine one desires[,] . . . . the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'" *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) (*citing Sherbert v. Verner*, 374 U.S. 398, 402 (1963)) (first emphasis added).  As this protection is "absolute," *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940),[9] the State may *never* "compel affirmation of a repugnant belief" or "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert*, 374 U.S. at 402.  This categorical protection is not limited to religious beliefs alone as the "First Amendment gives freedom of mind the same security as freedom of conscience." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971).  Indeed, "[o]ur political system and cultural life rest upon this ideal": that "each person should decide for . . . herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad.*, 512 U.S. at 641.  In short, the "First Amendment[] . . . creates a preserve where the views of the individual are made inviolate." *Baird*, 401 U.S. at 6.[10]  Defendants openly trespass upon this preserve.

Defendants explicitly targeted Miss Keeton's views and beliefs simultaneously throughout the remediation process.  (*See supra* Argument I.A.)  They initiated the remediation plan precisely because she expressed her beliefs inside and outside of class.  (Compl. ¶¶ 29–30, 39, 41–42, 72, 84, 97.)  They cross-examined her views and her religious beliefs in all three remediation meetings.  (*Id.* ¶¶ 43–49, 63–66, 71, 89–90, 96–101.)  They even went so far as to challenge the biblical foundations of her convictions, to characterize them as "prejudiced," and to recommend that she consider transferring to a Christian counseling program.  (*Id.* ¶¶ 43–52.)  They flatly rejected Miss

---

[9]     *Accord McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such" (citations omitted)); *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("The freedom to hold religious beliefs and opinions is absolute" (citations omitted)); *Sherbert*, 374 U.S. at 402 ("The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such" (citations omitted)).

[10]    *See also Barnette*, 319 U.S. at 642 (prohibiting government from "invad[ing] the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control").

Keeton's suggestion that she could maintain her beliefs without imposing her values on future clients. (*Id.* ¶¶ 63–64.) They emphasized time and again that they expected a fundamental change in her outlook, which would require her to "alter her beliefs" on the objectivity of moral standards. (*Id.* ¶¶ 66, 71, 104.) And documentary evidence echoes this conclusion:

- Dr. Schenck's e-mail to Miss Keeton: "*What is the issue is if you believe your personal beliefs and values should be the same beliefs and values for all people. This is the unethical part*—applying your own personal beliefs and values on other people and not truly accepting that others can have different beliefs and values that are equally valid as your own." (*Id.* ¶ 78 (emphasis added).)

- Addendum: "These statements indicate that you *think* certain people should act in accordance with your moral values, and/or that your *beliefs* are in some way to be superior to those of others. The *belief* that you possess a special knowledge about the way that other people should live their lives, and that others need to adopt a similar set of values contradicts the core principles of the American Counseling Association and American School Counselor Association Codes of Ethics, which define the roles and responsibilities of professional counselors." (Compl. Ex. C at 1 (emphasis added).)

- Remediation Plan: "Each month Jen will submit a two-page reflection to her advisor that summarizes what she learned from her research, how her study has *influenced her beliefs*, and how future clients may benefit from what she has learned. Based on these written reflections . . . faculty will decide the appropriateness of her continuation in the counseling program." (Compl. ¶ 34 (emphasis added).)

But the First Amendment *never* permits the government to penalize beliefs in this manner. *Sherbert*, 374 U.S. at 402. Indeed, it has long been established that State officials may not utilize belief-based litmus tests against citizens in schools or as a condition for entering a profession. *See, e.g., Baird,* 401 U.S. at 6; *Barnette*, 319 U.S. at 633–34.

As the Supreme Court said in overturning the State Bar of Arizona's decision to exclude a prospective member based on her unpopular communist beliefs:

> The First Amendment[] . . . prohibits a State from excluding a person from a profession or punishing him solely because . . . he holds certain beliefs. Similarly, when a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution.

*Baird*, 401 U.S. at 6 (citations omitted).  Similarly, the Supreme Court invalidated West Virginia's attempts to "require[] affirmation of a belief and an attitude of mind" through its compulsory flag salute and pledge law.  *Barnette*, 319 U.S. at 633.  The Court memorably declared:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*Id.* at 642.  By requiring the Pledge and flag salute, the Court explained that public school officials had "transcend[ed] constitutional limitations on their power and invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."  *Id.*  These principles control here.

At least as much as communism and patriotism, issues of human nature, gender, and sexual morality are matters touching the fundamentals of one's worldview.  *See id.*  Yet Defendants are coercing Miss Keeton to change her beliefs by conditioning her academic degree and the accompanying admission to the counseling profession on her "pledge" to affirm their orthodox views on such matters.[11]  If liberty of conscience cannot be infringed in the name of "national unity" or "patriotism" in the midst of a global conflict implicating national security, then it certainly cannot be compromised in the ambiguous name of "multicultural competence."

### C. DEFENDANTS ARE VIOLATING THE FIRST AMENDMENT COMPELLED SPEECH DOCTRINE.

"The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable."  *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).  It is black letter law that the government transgresses this principle when it "compel[s] affirmation of a belief with which the speaker disagrees," *Hurley*,

---

[11]     Defendants cannot evade culpability by arguing that they are merely conditioning a benefit (a public education) on Miss Keeton's willingness to say what she does not believe. For, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert*, 374 U.S. at 404–05.

515 U.S. at 573, or "requires the utterance of a particular message favored by the Government," *Turner Broad.*, 512 U.S. at 641.   But this is precisely what Defendants are doing to Miss Keeton.

Miss Keeton is a Christian who derives her convictions about gender, human sexuality, and other matters of ethical import from the Bible (Compl. ¶ 14), and she has clearly communicated these views to the Defendants on several occasions.   (*See, e.g., id.* ¶¶ 16, 76, 99–100, 108.)

The defendant professors not only oppose Miss Keeton's sincerely held religious beliefs, they seek to compel her to affirm their pro-GLBTQ orthodoxy.   (*See supra* Argument I.A–B.)   In fact, the Remediation Plan requires her monthly to explain to the professors how studying pro-GLBTQ sources has "influenced her beliefs" so that they can determine the "appropriateness of her continuation in the counseling program."   (Compl. ¶ 34.)   Likewise, Defendants insist that she affirm the homosexual choices of hypothetical *future* clients.

> Right now, Jen cannot *affirm* and attend to relationship issues of gay and lesbian persons, but she recognizes that through the remediation plan she may further learn to separate personal values and beliefs from those of the client so that she may attend to <u>any</u> need of *future* clients in an ethical manner.

(*Id.* ¶ 106 (italics added).)   This homosexuality-affirming message violates Miss Keeton's core religious beliefs.   Yet if she fails to speak it to Defendants and does not commit to them that she will affirm the conduct of transgender and homosexual clients she *might* one day encounter, she will fail the Remediation Plan and "will be dismissed from the counseling program."   (Compl. Ex. C at 2.)   This is a blatant compelled speech violation.

Since 1943, both the Supreme Court and the Eleventh Circuit have consistently held that a state body may not compel a citizen to speak what she does not want to say.   *Barnette*, 319 U.S. at 642 (invalidating educational requirement that Pledge of Allegiance be recited); *Shelton*, 364 U.S. at 480, 490 (striking down statute compelling public school teachers to disclose organizations to which they belong); *Torcaso v. Watkins*, 367 U.S. 488, 489–90, 495–96 (1961) (nullifying state

constitutional requirement that public officials declare a belief in God); *Keyishian*, 385 U.S. at 602–04 (nullifying loyalty oaths as a precondition to public university employment); *Baird*, 401 U.S. at 5, 7–8 (abolishing state bar requirement that applicants answer questions about their personal beliefs); *Wooley*, 430 U.S. at 715, 717 (striking statute requiring citizens to display "Live Free or Die" on their license plate), *Hurley*, 515 U.S. at 579–80 (holding that state law could not force parade organizers to include an affirming message regarding homosexual behavior that the organizers disagreed with); *Holloman*, 370 F.3d at 1269–77 (holding that school officials violated student's rights by punishing him for refusing to say the Pledge of Allegiance).[12]  If the State cannot compel car owners to display "Live Free Or Die" on their autos, or coerce parade organizers to include homosexual advocates in their parade, or force students to say the Pledge of Allegiance, then Defendants certainly cannot require Miss Keeton to pledge her allegiance to ASU's conception of "multicultural competence" when such a message contravenes her fundamental convictions.

### D. DEFENDANTS ARE RETALIATING AGAINST MISS KEETON FOR EXERCISING HER FIRST AMENDMENT RIGHTS.

To show retaliation, Miss Keeton "must establish first, that [her] speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

#### 1. MISS KEETON ENGAGED IN PROTECTED EXPRESSION.

Miss Keeton expressed her religious beliefs and views regarding transgender and homo-

---

[12]     *See also Turner Broad.*, 512 U.S. at 641 ("Government action . . . that requires the utterance of a particular message favored by the Government, contravenes this essential right" and "pose[s] the inherent risk that the Government seeks . . . to suppress unpopular beliefs or information or to manipulate the public debate through coercion rather than persuasion."); *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) ("[T]he [First] Amendment may prevent the government from compelling individuals to express certain views . . . ."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (describing "true 'compelled-speech' cases" as ones where "an individual is obliged personally to express a message he disagrees with").

sexual identification and conduct in various settings—inside and outside of class; in conversations with other students and with her professors; in her multiple remediation plan meetings; and in correspondence with the faculty.  Her expression of her religious views is entitled to the full protection of the First Amendment. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("Our precedent establishes that private religious speech . . . is . . . fully protected under the Free Speech Clause. . . .").  And her advocacy of those views is likewise protected. *GLBA*, 110 F.3d at 1547 (holding that it is well-established that the First Amendment protects advocacy—even "advocacy to violate a law").

### 2. DEFENDANTS TOOK ADVERSE ACTION AGAINST MISS KEETON.

Miss Keeton easily clears the low threshold for adverse action as Defendants' actions inarguably constituted more than a "*de minimis* inconvenience to her exercise of First Amendment rights." *Bennett*, 423 F.3d at 1252 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)); *id.* at 1254 ("[T]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable" (citation omitted)).  According to the Eleventh Circuit, a "verbal censure" from a teacher chills a student's First Amendment rights. *Holloman*, 370 F.3d at 1268–69.  After all, the mere "threat of sanctions may deter the[] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Defendants' actions against Miss Keeton are clearly "adverse actions" because they "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254.  Defendants "verbal[ly] censur[ed]" Miss Keeton by condemning her views and beliefs in writing and in multiple remediation meetings. *See Holloman*, 370 F.3d at 1268–69.  They characterized her as "prejudiced" among other negative things; opined that her

views were unethical, unprofessional, and rendered her unfit for counseling or teaching; and further warned that her views could be harmful or potentially lethal. (Compl. ¶¶ 43–52, 65, 100–01.)  They exacerbated these censures with the continuing threat to dismiss her from the counseling program.  *Button*, 371 U.S. at 433.  Moreover, their censures have *actually chilled* Miss Keeton from speaking in a recent class.  (Compl. ¶¶ 111–12.)  Undoubtedly, Defendants actions would deter a person of ordinary firmness from exercising First Amendment rights.

### 3. DEFENDANTS' ADVERSE ACTIONS WERE SUBSTANTIALLY MOTIVATED BY MISS KEETON'S PROTECTED EXPRESSION.

Defendants cannot seriously challenge this element given the wealth of evidence in which they make explicit references to Miss Keeton's "beliefs" and "views" on gender and sexual morality as the reason for the remediation and threatened dismissal.  (*See supra* Argument I.A–C.)  Without restating all that evidence, the nexus between her speech and their retaliation is sufficiently demonstrated by the following:

- Defendants initiated the Remediation Plan because Miss Keeton "voiced disagreement . . . with the gay and lesbian 'lifestyle'" in class and outside of class "she has tried to convince other students to support and <u>believe</u> her views." (Compl. ¶¶ 29–30.)

- Defendants' initial concerns were further confirmed by her email comments explaining, "My Christian moral views are not just about me.  I think the Bible's teaching is true for all people, and it shows the right way to live." (Compl. Ex. C at 1; Compl. ¶ 76.)

- In each of the three remediation meetings, Defendants told Miss Keeton that she would need to change her "views" and "beliefs" in order to continue in the program. (Compl. ¶¶ 43–51, 65–66, 71, 85–90, 104.)

- Miss Keeton cannot successfully complete the Remediation Plan unless she demonstrates in her papers how the pro-GLBT workshops, material, and experiences have sufficiently "influenced her beliefs." (*Id.* ¶ 34.)

- "[F]ailure to complete all elements of the remediation plan will result in dismissal from the Counselor Education Program." (*Id.* ¶ 35.)

Thus, the tie between Miss Keeton's expression and Defendants' censure and dismissal threats is clear.

Similarly, Defendants' assertion that Miss Keeton's statements are "unethical" rings hollow for the simple reason that her statements were not presented in the context of a professional counseling relationship, but in the broader marketplace of ideas—both in and out of the classroom. She has not "imposed values" on or "discriminated" against any clients. (*Id.* ¶¶ 130–31.) Indeed, the written Remediation Plan itself emphasizes the purely hypothetical nature of Miss Keeton's alleged ethical offense. The Plan states that "[h]er lack of awareness of how her beliefs may negatively impact *future* clients is of great concern" (Compl. Ex. B at 4), and thus, requires her to reflect upon "how *future* clients may benefit from what she has learned." (Compl. ¶ 34 (emphasis added.) Likewise, Defendants confirmed at the end of the third remediation meeting that Miss Keeton could satisfy their mandate only if she commits to "attend to <u>any</u> need of *future* clients in an ethical manner." (*Id.* ¶ 106 (italics added).)

A state university may not anticipatorily punish a student today for something it speculates that she *might say* in the future. That the target of Defendants' punishment intrudes into the domain of Miss Keeton's beliefs, and that Miss Keeton has denied that she will discriminate against or impose her values on anyone, only aggravates their assault on her. The future-orientation of Defendants' "ethics concerns" reveals the true nature of their coercive proselytizing exercise: to remediate her soul now. The First Amendment does not permit the State to pursue that project.

## II.   MISS KEETON IS SUFFERING IRREPARABLE INJURY.

"[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor*, 458 F.3d at 1271–72 (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Miss Keeton can show irreparable injury because she has experienced—and continues to face—a "chilling effect" on and "direct penalization" of her First Amendment rights. *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *KH Outdoor*, 458 F.3d at 1272.

21

Defendants repeatedly subjected Miss Keeton to verbal censure, cross-examination, pros-elytizing, and threatened dismissal in the course of an extended disciplinary process that remains open even today.  Her First Amendment rights have been and continue to be violated every day that her speech is chilled under the shadow of expulsion.  The loss of her First Amendment rights cannot be cured by monetary damages, and thus constitutes irreparable injury.  *KH Outdoor*, 458 F.3d at 1272.   As these irreparable harms remain on-going, Miss Keeton requests that preliminary injunctive relief be granted promptly so she may remain in the counseling program.

### III.   THE REQUESTED INJUNCTION WILL NOT HARM DEFENDANTS.

The threatened injury to Miss Keeton clearly outweighs any hypothetical damage an in-junction might cause Defendants.  The ongoing loss of Miss Keeton's First Amendment free-doms constitutes a "serious and substantial injury," and Defendants simply have no legitimate interest in continuing their unconstitutional conduct.  *Id.*  This is especially true here, where an injunction will simply maintain the status quo by keeping Miss Keeton enrolled in the counseling program, and remove the uniquely discriminatory and oppressive remediation terms from con-trolling her thoughts and speech as she proceeds with her studies.

### IV.   THE REQUESTED INJUNCTION WILL NOT BE ADVERSE TO THE PUBLIC INTEREST.

The requested injunction will serve the public interest because "it is always in the public interest to protect First Amendment liberties."  *Id.* (citations omitted).

### CONCLUSION

Miss Keeton simply shared her normative views on gender and homosexuality with the faculty and with her classmates.  For this, Defendants subjected her to an extended disciplinary proceeding rife with cross-examination, censure, and proselytizing—all of which was backed by their promise to expel her if she did not alter her views and allegiances and commit to future speech and conduct to their liking.  In doing so, they crossed clear constitutional lines and trans-

gressed core constitutional rights.  Miss Keeton continues to suffer under the chilling effect of their actions.  For the forgoing reasons, Miss Keeton respectfully requests that this Court grant her motion for preliminary injunction.

Respectfully submitted on this the 21st day of July, 2010.

|  |  |
|---|---|
|  | */s/ Charles C. Stebbins, III* |
| JEFFREY A. SHAFER* | CHARLES C. STEBBINS, III |
| Illinois Bar No. 6230713 | Georgia Bar No. 667350 |
| Ohio Bar No. 0067802 | Alabama Bar No. 854 |
| ALLIANCE DEFENSE FUND | WARLICK, TRITT, STEBBINS & HALL, LLP |
| 801 G Street NW, Suite 509 | 209 7th Street |
| Washington, DC 20001 | Augusta, Georgia 30901 |
| (202) 393–8690 | (706) 722–7543 |
| (202) 347–3622—facsimile | (706) 722–1822—facsimile |
| jshafer@telladf.org | cstebbins@wtshlaw.com |
| *Lead Counsel* |  |

JOSEPH J. MARTINS*
North Carolina Bar No. 31666
TRAVIS C. BARHAM*
Arizona Bar No. 024867
ALLIANCE DEFENSE FUND
12 Public Square
Columbia, Tennessee 38401
(931) 490–0591
(931) 490–7989—facsimile
jmartins@telladf.org
tbarham@telladf.org

**ATTORNEYS FOR PLAINTIFF**

*Motion for admission *pro hac vice* pending submission