IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JENNIFER KEETON,             *
                             *
        Plaintiff,           *
                             *
        v.                   *          CV 110-099
                             *
MARY JANE ANDERSON-WILEY,    *
et al.,                      *
                             *
        Defendants.          *

---

**O R D E R**

---

Before the Court in the captioned case is Plaintiff Jennifer Keeton's (Plaintiff) motion for preliminary injunction. (Doc. no. 3.) Pursuant to Plaintiff's request, the Court heard oral argument and conducted an evidentiary hearing regarding the motion on August 11, 2010. While Plaintiff may ultimately prevail in this case, the current record reveals that she has failed to clearly establish her high burden of persuasion of a "substantial likelihood" of success on the merits of her case. Therefore, Plaintiff's motion for a preliminary injunction, an extraordinary remedy, is **DENIED**.

Before discussing the merits of Plaintiff's motion, I would like to briefly address what this case involves. This

case is not about the propriety of Plaintiff's views or beliefs, or any of the Augusta State University (ASU) counseling faculty's views or beliefs, regarding the topics implicated in this case. Despite any suggestion to the contrary, this is not a case pitting Christianity against homosexuality. This case is only about the constitutionality of the actions taken by Defendants regarding Plaintiff within the context of Plaintiff's Counselor Education masters degree program at Augusta State University (ASU), and no more.

## I. Background

Because of the limited nature of the issue before the Court at this phase of the litigation, the Court summarizes the salient facts. In the fall of 2009, Plaintiff enrolled in ASU's Counselor Education masters degree program, where she is currently enrolled as a graduate student. Plaintiff's goal is to become a school counselor. The counseling program has adopted as part of its curriculum the American Counseling Associations' (ACA) Code of Ethics, applicable to counselors-in-training.[1]

---

[1] The Council for Accreditation of Counseling and Related Educational Programs (CACREP), ASU's accrediting body, requires that its accredited programs must provide students with an understanding of, *inter alia*, the ACA's ethical standards. (Resp. Ex. D-1 at 11.)

Plaintiff, a Christian, has voiced her religious-based, personal views on sexual morality—particularly, the morality of homosexual conduct—in classroom discussions, in school papers,[2] in conversations with her professors, and outside the classroom with fellow students; she has also encouraged fellow students to adopt her views. As the counseling program faculty stated, "Plaintiff has voiced disagreement in several class discussions and in written assignments with the gay and lesbian 'lifestyle.'" (Compl. Ex. B at 3.) Plaintiff has stated that she condemns homosexuality based upon the Bible's teachings. Moreover, Plaintiff has stated that she believes sexual behavior is the result of accountable personal choice rather than an inevitability deriving from deterministic forces. (Compl. ¶ 16.) Plaintiff also has affirmed binary male-female gender, with one or the other being fixed in each person at their creation, and not a social construct or individual choice subject to alteration by the person so created. (Id.) Finally, Plaintiff has expressed her view that homosexuality is a "lifestyle," not a "state of being." (Id.)

_____

[2] Specifically, in a school paper assignment, Plaintiff wrote that "it would be hard [for her] to work with [the gay, lesbian, bisexual, transgender, and queer/questioning] population." (Resp. Ex. F at 3.) Plaintiff also stated in her paper that "[i]t will be beneficial for [her] to work in a school that aligns with [her] values and beliefs." (Id. at 3-4.)

The counseling faculty became concerned that Plaintiff may not be able to separate her personal, religious-based views on sexual morality from her professional counseling duties, in violation of the ACA's Code of Ethics. The faculty further concluded that some of Plaintiff's views on sexual behavior depart from psychological research. (Compl. Ex. B at 3.) The faculty also claim to have received unsolicited reports from a fellow student in the counseling program that Plaintiff "has relayed her interest in conversion therapy for [gay, lesbian, bisexual, transgender, and queer/questioning (GLBTQ)] populations, and she has tried to convince other students to support and believe her views." (Id.) Moreover, the faculty also concluded that research in psychological peer-reviewed journals reveals that conversion therapy is ineffective in changing an individual's sexual orientation from same-sex attractions to opposite-sex attractiveness. (Id. at 4.)

Based upon these conclusions and pursuant to the counseling program's official policy, Plaintiff was placed on "remediation status" by the program's faculty.[3] Plaintiff

---

[3] The counseling program's policies are contained in the program's student handbook, which states that "[w]hen a student's progress is not satisfactory on interpersonal or professional criteria unrelated to academic performance, she or he may be placed on remediation status." (Compl. Ex. A at 27.) At the hearing, discussed further below, Dr. Anderson-Wiley, a faculty remember in ASU's counseling program and a teacher of Plaintiff, testified that placing a student on remediation

4

has been informed that, in order to have her remediation status removed, she must comply with the terms of a Remediation Plan crafted by program faculty.[4] In Plaintiff's Remediation Plan, the faculty state that they "question [Plaintiff]'s ability to become an effective practitioner in the counseling field without more deliberate and intentional action to further develop her multicultural counseling awareness, knowledge, and skills specifically towards working with GLBTQ populations." (Compl. Ex. B at 4.) Dr. Anderson-Wiley, Associate Professor of Counselor Education in ASU's counseling program, informed Plaintiff by letter that, should Plaintiff not complete the Remediation Plan to the faculty's satisfaction, Plaintiff will be expelled from the counseling program. (Compl. Ex. C at 2.)

---

status is not a disciplinary measure, but rather a means to address a student's professional deficiencies.

[4] The counseling program handbook provides:

The student will receive a Remediation Plan from her or his advisor (which has been developed after a personal conference with the advisor and another faculty member(s)) outlining the faculty's concerns and stating that the student has been placed on remediation status. In addition, the Remediation Plan will delineate what conditions the student must meet to be removed from remediation status. The student will also be informed of the consequences of the failure to comply with the outlined conditions, including the possibility that the student will be dropped from the Program.

(Compl. Ex. A at 27.)

Plaintiff's Remediation Plan has two portions, the first of which centers on Plaintiff's writing composition skills and requires her to complete items one through six in the Remediation Plan.[5] The second portion of the Plan[6] sets forth that Plaintiff, in order "[t]o address issues of multicultural competence and develop understanding and empathy," must complete the following tasks, numbered seven through twelve, listed below:

7.   Jen will attend at least three workshops prior to the end of the fall 2010 semester which emphasize improving cross-cultural communication, developing multicultural competence, or diversity sensitivity training toward working with GLBTQ populations. She will provide to her advisor evidence in the form of attendance certificates.

8.   Jen will continue to develop her knowledge base on GLBTQ issues by outside reading on the topic. She will read at least ten articles in peer-reviewed counseling or psychological journals that pertain to improving counseling effectiveness with GLBTQ populations. There is much research available on the ALGBTIC [Association for Lesbian, Gay, Bisexual, and Transgender Issues in Counseling] webpage under Resources.

9.   Jen will work to increase exposure and interaction with gay populations. One such activity could be attending the Gay Pride

[5] Plaintiff has agreed to complete this portion of the Remediation Plan.

[6] It is this portion of the Remediation Plan that Plaintiff challenges.

Parade in Augusta. She will report on these interactions in her reflections (below).

10. Jen will familiarize herself with the ALGBTIC Competencies for Counseling Gays and Transgender Clients.

11. Each month Jen will submit a two-page reflection to her advisor that summarizes what she learned from her research, how her study has influenced her beliefs, and how future clients may benefit from what she has learned.

12. Based on these written reflections and two scheduled meetings with Jen prior to December 2010, faculty will decide the appropriateness of her continuation in the counseling program.

(Compl. Ex. B at 5.) Plaintiff, after three meetings with the counseling program's faculty,[7] initially agreed to participate in the second portion of the Remediation Plan. But, upon further reflection, Plaintiff decided not to participate in the second portion of the Plan, which she states she cannot successfully complete given her personally-held convictions on sexual morality.

---

[7] At the first meeting, Plaintiff claims that Professor Anderson-Wiley stated to her that "Christians see [the GLBTQ] population as sinners[,]" and also stated to Plaintiff that she must choose between her religious beliefs contained in the Bible and the ACA Code of Ethics. At the hearing conducted on August 11, 2010, discussed below, Professor Anderson-Wiley flatly denied making these statements.

The disputed nature of these facts is of no moment. Because this is not a motion to dismiss under Rule 12(b)(6) or a motion for summary judgment, the Court is not obligated to view the facts most favorable in light of either party. Rather, the Court is required to ascertain whether Plaintiff has shown a substantial likelihood of success on the merits of her case.

Plaintiff then decided to sue. Plaintiff's verified complaint and motion for preliminary injunction were filed on Wednesday, July 21, 2010. The verified complaint alleges counts for (1) viewpoint discrimination, retaliation, and compelled speech, in violation of Plaintiff's First Amendment right to freedom of speech, (2) violation of Plaintiff's First Amendment right to the free exercise of religion, (3) violation of Plaintiff's right to be free of unconstitutional conditions, (4) violation of Plaintiff's Fourteenth Amendment right to equal protection, (5) violation of Plaintiff's right to the freedom of speech under ASU's official policies, and (6) violation of Plaintiff's Fourteenth Amendment right to due process. Plaintiff's prayer requests declaratory, injunctive, and monetary relief.

In addition to filing her verified complaint, Plaintiff moved for a preliminary injunction that would prevent her expulsion from ASU's counseling program based upon what she alleges to be violations of her civil rights and relieve her from the terms of the counseling program's allegedly unlawful Remediation Plan. Because of time constraints, Plaintiff did not brief all of her claims for injunctive relief or all the legal bases for the relief she requests in her verified complaint. Plaintiff has, however,

briefed several of her asserted causes of action for purposes of the requested preliminary injunction, as follows: First Amendment viewpoint discrimination, violation of the First Amendment compelled speech doctrine, violation of the First Amendment right to belief of one's choice, and First Amendment retaliation.

On August 9, 2010, Defendants responded in opposition to the motion for preliminary injunction. (Doc. no. 35.) Attached to Defendants' response are, *inter alia*, the affidavits of Dr. Anderson-Wiley, Dr. Paulette Schenck, Assistant Professor of Counselor Education in ASU's counseling program, and Dr. Richard Deaner, Assistant Professor of Counselor Education in ASU's counseling program. (Doc. no. 35, Exs. A, B, & C.) All three professors testified that they never told Plaintiff that she was required to change her religious beliefs in order to stay in the counseling program, and all three stated that, during the course of Plaintiff's participation in the counseling program, they became aware of Plaintiff's admitted reluctance to counsel the GLBTQ population. (Id.)

Defendants also provided affidavits of two of Plaintiff's classmates in the counseling program. (Resp. Exs. E & H.) Both students took classes with Plaintiff the past two semesters. One of the students testified that

"During one . . . discussion outside of the classroom, Plaintiff expressed to me her view that the gay population could be changed and that, *as school counselors,* we could help them." (Resp. Ex. E ¶ 20)(emphasis in original). The student further testified as follows:

> During another discussion outside of the classroom, Plaintiff admitted to me that in a counseling situation where a client discloses to her that he/she is gay, it *is Plaintiff's intention to tell the client that their behavior is morally wrong* and then help the client 'change' that behavior. Plaintiff admitted further that if she were not successful in helping this hypothetical client 'change,' she would refer him/her to someone practicing conversion and reparative therapy.

(Id. ¶ 21) (emphasis supplied). The second student stated the following:

> I recall an occasion in Dr. Deaner's Communication Skills in Counseling Course where Plaintiff expressed the concern that to continue in the counseling program she might have to alter her religious beliefs. In response to that statement, Dr. Deaner emphasized to Plaintiff that that was not what was required. Dr. Deaner explained that what was required was for us to be aware of our beliefs and not impose those beliefs on the client so as not to harm the client.

(Resp. Ex. H ¶ 19.) The second student continued,

> I recall an occasion in Dr. Schenck's School Counseling class, where Plaintiff expressed that because of her views on homosexuality she would try to work at a school with no LGBTQ population. I also recall Plaintiff stating in this class that she would refer LGBTQ clients to another counselor.

(Id. ¶ 20.) Finally, both students testified that they have never heard Dr. Anderson-Wiley, Dr. Schenck, or Dr. Deaner tell Plaintiff that she must change her religious beliefs in order to stay in the school counselor program. (Resp. Ex. E ¶¶ 11-13 & Ex. H ¶¶ 13-15.)

On August 11, 2010, per Plaintiff's request, the Court conducted a hearing regarding the motion for preliminary injunction, which included oral argument on the legal issues and testimony from witnesses.[8]

Plaintiff did not testify at the hearing, nor did she present any witnesses in support of her motion. Defendants, however, presented several witnesses to the Court, including Dr. Anderson-Wiley and Dr. Schenck. Dr. Anderson-Wiley testified that, in order for Plaintiff to successfully complete the Remediation Plan, Plaintiff must be willing to refrain, in the counseling setting, consistent with professional counseling ethical rules, from imposing her personal views on a counselee's homosexual conduct. Dr. Anderson-Wiley also testified that Plaintiff is not the only student who has been placed on remediation status in ASU's counseling program, and noted that Remediation Plans are utilized with students in the program

---

[8] Although not all of the hearing testimony is summarized here, the Court notes the salient points.

with regularity to address various professional deficiencies, including sensitivity to certain populations.

Next, Dr. Schenck testified. She clarified to the Court that, should Plaintiff not agree to complete all terms of the Remediation Plan, Plaintiff would not be allowed to enroll in the practicum portion of the counseling program this fall and would be expelled from the program altogether at the conclusion of the fall semester in December, 2010. Furthermore, Dr. Schenck testified about an encounter she had with Plaintiff that occurred after a class session. At that time, according to Dr. Schenck, she posed a hypothetical counseling scenario to Plaintiff. In the hypothetical, the counselee inquires of Plaintiff as to the morality of homosexual conduct. Plaintiff stated to Dr. Schenck that she would, in such a situation, explain to the counselee that, consistent with Plaintiff's personal views, the conduct is not moral.

Finally, both Dr. Anderson-Wiley and Dr. Schenck testified that the Remediation Plan was crafted for Plaintiff, not as retaliation for voicing her personal beliefs, but only because the faculty questioned Plaintiff's ability to perform as a counselor in a professionally ethical manner, as required by the counseling program's curriculum.

## II. Legal Standard

A preliminary injunction may issue only if Plaintiff, the moving party, demonstrates each of the following:

> (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest.

BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 968 (11th Cir. 2005) (citation omitted). "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974).[9] The Court will therefore examine whether Plaintiff has, at this stage of the case, established the required factors in deciding whether to grant the preliminary injunction.

## III. Discussion

While there is no case satisfactorily on point to definitively control this matter, one thing is clear: the

---

[9] Fifth Circuit decisions handed down prior to October 1, 1981, are binding in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

Supreme Court and the Eleventh Circuit have held that matters of educational policy should be left to educators and it is not the proper role of federal judges to second guess an educator's professional judgment. Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 130 S. Ct. 2971, 2988 (2010) ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'")(quoting Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206 (1982)); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1985)(holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns[,]" and stating that "[t]his standard is consistent with [the Supreme Court's] oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked

to review the substance of a genuinely academic decision .
. . they should show great respect for the faculty's
professional judgment. Plainly, they may not override it
unless it is such a substantial departure from accepted
academic norms as to demonstrate that the person or
committee responsible did not actually exercise
professional judgment."); Healy v. James, 408 U.S. 169, 180
(1972)("[The Supreme] Court has long recognized 'the need
for affirming the comprehensive authority of the States and
of school officials, consistent with fundamental
constitutional safeguards, to prescribe and control conduct
in the schools.'")(quoting Tinker v. Des Moines Indep.
Cmty. Sch. Dist., 393 U.S. 503, 507 (1969)); Bishop v.
Aronov, 926 F.2d 1066, 1074-75 (11th Cir. 1991) (stating
that "[f]ederal judges should not be ersatz deans or
educators" in case adopting the Hazelwood standard at the
university level);[10] Virgil v. Sch. Bd. of Columbia Cnty.,
Fla., 862 F.2d 1517, 1520 (11th Cir. 1989) ("In matters
pertaining to . . . curriculum, educators have been
accorded greater control over expression than they may
enjoy in other spheres of activity.") (citing Hazelwood,
484 U.S. at 267-71)).

---

[10] Other Circuits have followed the Hazelwood framework at the
university level as well. See Hotsy v. Carter, 412 F.3d 731, 735 (7th
Cir. 2005); Axson-Flynn v. Johnson, 356 F.3d 1277, 1289 (10th Cir.
2004); Brown v. Li, 308 F.3d 939, 950-51 (9th Cir. 2002).

Furthermore, Ward v. Wilbanks, No. 2:09-cv-11237, 2010 WL 3026428 (E.D. Mich. July 26, 2010), the case most factually similar to the instant one, utilized the Hazelwood framework in the university setting. There, a Masters of Counseling student at Eastern Michigan University (EMU), while participating in a practicum course, refused to counsel a counselee who sought counseling regarding depression but who had previously been counseled about his homosexual relationship. According to the student, her personally-held, Christian moral view on homosexuality prevented her from affirming homosexual conduct in the counseling setting. When the counseling student was ultimately dismissed from the program, she sued EMU officials alleging, *inter alia*, First Amendment claims under the Speech Clause, the Free Exercise Clause, and a First Amendment retaliation claim.

The district court applied Hazelwood and granted the defendants summary judgment on the student's Speech Clause claim. The court held as follows: "Having demonstrated that its Policy is *reasonably related to legitimate pedagogical concerns*, the University did not violate plaintiff's First Amendment free speech rights." Id. at *16 (emphasis added). The district court also granted the defendants summary judgment on the student's Free Exercise clause claim. The

16

district court concluded that EMU's curricular requirement—
that its counseling students must follow the ACA Code of
Ethics—was generally applicable and applied equally to all
students enrolled in the program, regardless of religion.
Id. at *17. The district court also found that the
curricular requirement was not aimed at particular
religious practices, and that there was no system of
"particularized exemptions" by which students enrolled in
EMU's program would be allowed to deviate from the ACA Code
of Ethics and still graduate. Id. The district court also
granted summary judgment on the plaintiff's first amendment
retaliation claim. The court reasoned that "Ward's refusal
to counsel the client in question constitutes a refusal to
complete a curriculum requirement, and defendants' reasons
for dismissing plaintiff are academically legitimate,
rather than a mere pretext to retaliate against her for
expressing her religious beliefs." Id. at *20.

With these legal principles in mind, the Court turns
to the merits of Plaintiff's motion. The first element
Plaintiff must show in order to receive her requested
injunction is a substantial likelihood of success on the
merits of her lawsuit. In her verified complaint and the
instant motion, Plaintiff alleges that Defendants' actions
constitute a continuing and irreparable violation of her

17

First and Fourteenth Amendment rights. Specifically, Plaintiff alleges claims for First Amendment viewpoint discrimination, violation of the First Amendment compelled speech doctrine, violation of the First Amendment right to belief of one's choice, and First Amendment retaliation. The Court will discuss each claim in turn.

### A. Free Speech

Plaintiff asserts that Defendants have violated her rights arising out of the Speech Clause of the First Amendment, that states, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, Near v. Minnesota, 283 U.S. 697, 707 (1931), applies to state and municipal governments, state-created entities, and state and municipal employees, W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943). Thus, the Speech Clause's restrictions apply to the Board of Regents as an entity of the State of Georgia, and ASU faculty and administrators as State of Georgia employees.

## 1. Viewpoint Discrimination

Plaintiff first claims that Defendants violated the Free Speech Clause of the First Amendment by disciplining Plaintiff based upon her viewpoint. Plaintiff, however, has not established that she is substantially likely to succeed on the merits of this claim.

It is clear that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restrictions." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). See also Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1279 (11th Cir. 2004); Gay Lesbian Bisexual Alliance (GLBA) v. Pryor, 110 F.3d 1543, 1549-50 (11th Cir. 1997). Here, however, Plaintiff has not provided evidence that the ASU faculty imposed the May 27, 2010 Remediation Plan *because* the faculty personally disagree with Plaintiff's expressed personal views, or that the goal of the Plan itself was to *alter* any of Plaintiff's *personally held* views, sufficient to establish that she is substantially likely to succeed on the merits of her claim. To the contrary, the record suggests, and the testimony at the hearing bolsters, that the Plan was imposed because Plaintiff exhibited an inability to *counsel* in a professionally ethical manner—

that is, an inability to resist imposing her moral viewpoint on counselees—in violation of the ACA Code of Ethics, which is part of the ASU counseling program's curriculum.

Furthermore, Plaintiff's refusal to participate in the Plan, which requires her to read counseling literature geared towards counseling GLBTQ persons and attend workshops geared towards that same end, demonstrates Plaintiff's unwillingness to complete curricular requirements. The faculty made clear in various meetings with Plaintiff and through correspondence that it was not Plaintiff's personal beliefs that were their concern, but rather only her inability to *separate* her personal beliefs in the judgment-free zone of a professional counseling situation, as mandated by the ethical standards incorporated into ASU's curriculum.

Once put on notice of Plaintiff's difficulty with this portion of her professional curriculum, the faculty decided to craft Plaintiff's Remediation Plan—a tool used not only with Plaintiff, but other students as well—in order to address various areas of concern. Whether I would have imposed the Remediation Plan, or what I would have included in the Plan itself, is not the question, for the Supreme Court instructs that educators, not federal judges, are the

ones that choose among pedagogical approaches. Martinez, 130 S. Ct. at 2988-89. I will not, especially at this early stage of the litigation, serve as an "ersatz dean." Bishop, 926 F.2d at 1075. In fact, judicial restraint mandates that I not.

That is not to say that in the curricular setting university professors enjoy carte blanche authority to restrict speech, or to punish students due to their speech, with impunity. The Court could, as the Supreme Court has instructed, override the faculty's decision to impose Plaintiff's Remediation Plan if the Plan's imposition "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 474 U.S. at 225. That is, the faculty's decision could be overridden if it simply amounts to no professional judgment at all—a mere pretext. See, e.g., Axson-Flynn, 356 F.3d at 1292-93 (stating "we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was *pretextual*[,]" and reversing summary judgment for university defendants because, after viewing the evidence in a light most favorable to the plaintiff, there was a genuine dispute of fact regarding

university's motives for requiring plaintiff to fulfill certain curricular requirements).

As discussed above, however, the limited record at this point in the litigation suggests that the Remediation Plan was imposed upon Plaintiff not because of mere disagreement with her viewpoints, but because of Plaintiff's inability to resist imposing her moral viewpoint on counselees, a position contrary to the ethical rules incorporated into the ASU counseling program's curriculum.[11] Finally, though this is not an adjudication on the merits, incorporation of the ACA Ethical Code into the ASU counseling program's curriculum, and requiring students to adhere to the Code as a curricular requirement, appears at this time to be "reasonably related to legitimate pedagogical concerns," Hazelwood, 484 U.S. at 273. The ASU counseling program has both a legitimate pedagogical interest in maintaining accreditation with the Council for Accreditation of Counseling and Related Educational

---

[11] To the extent the Court gleans evidence of viewpoint discrimination from the record, it is the allegation that Professor Anderson-Wiley stated to Plaintiff that "Christians see [the GLBTQ] population as sinners[,]" and that Plaintiff must choose between her religious beliefs contained in the Bible and the ACA Code of Ethics. As discussed *supra*, at the August 11, 2010, hearing, Professor Anderson-Wiley denied ever making these statements.

Assuming, without deciding, that this is enough to establish a genuine dispute of material fact regarding the faculty's true motivation for imposing the Remediation Plan, it is nevertheless not enough, at this stage of the litigation, to clearly establish a substantial likelihood of success on the merits.

Programs (CACREP) and in producing counselors with an ability to counsel vast segments of the population, consistent with the ethical standards adopted by the program.

## 2. Compelled Speech

Plaintiff next argues that, by requiring her "to affirm the pro-LGBTQ orthodoxy" and submit monthly updates as to how the Remediation Plan has influenced her beliefs, Defendants are violating the First Amendment doctrine of compelled speech. None of the cases Plaintiff cites in support of this claim arise out of the curriculum of a university-level educational program.[12] Ultimately, the Court concludes that Plaintiff has not met her heavy burden to clearly establish that she is, at this point, substantially likely to succeed on the merits of this claim.

The faculty have made clear that their concern is not Plaintiff's personal beliefs, but rather how those beliefs affect Plaintiff's ability to counsel in an ethical manner

---

[12] The Supreme Court has made clear that First Amendment cases arising in the school context must be analyzed in the particular factual setting in which they arise: "[o]ur inquiry is shaped by the educational context in which it arises: 'First Amendment rights,' we have observed, 'must be analyzed in light of the special characteristics of the school environment.'" Martinez, 130 S. Ct. at 2988 (quoting Widmar v. Vincent, 454 U.S. 263, 268 n.5 (1981)).

in accordance with the program's curriculum. This is true regarding Plaintiff's reflection papers, which require that Plaintiff discuss how the Plan has "influenced her beliefs[.]" The record indicates that the belief the faculty is referring to, rather than Plaintiff's personal views on sexual morality, is the belief that *Plaintiff's moral view is preferable to a homosexual counselee's moral view*, and that therefore *Plaintiff ought to tell the counselee as much in a counseling setting*. To the extent that Defendants compel Plaintiff to speak at all by requiring that she "affirm" GLBTQ conduct in a counseling setting, they demand nothing more than Plaintiff's adherence to the ACA Code of Ethics, which, as discussed above, appears to be, at this stage of the litigation at least, "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273. For these reasons, the Court cannot conclude that Plaintiff's compelled speech claim is substantially likely to succeed on the merits.

### B. Free Exercise

Plaintiff also argues that Defendants have violated her rights arising out of the Free Exercise Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or

24

*prohibiting the free exercise thereof . . . .*" U.S. Const.
amend. I (emphasis added). The Free Exercise Clause has
been made applicable to the States by incorporation into
the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S.
296, 303 (1940), and therefore applies to Defendants.

"The free exercise of religion means, first and
foremost, the right to believe and profess whatever
religious doctrine one desires. Thus, the First Amendment
obviously excludes all 'governmental regulation of
religious *beliefs* as such.'"[13] Emp't Div. v. Smith, 494 U.S.
872, 877 (1990) (emphasis in original) (citing Sherbert v.
Verner, 374 U.S. 398, 402 (1963)). Nevertheless, "every
person cannot be shielded from all the burdens incident to
exercising every aspect of the right to practice religious
beliefs." United States v. Lee, 455 U.S. 252, 261 (1982).

The prevailing constitutional standard under the Free
Exercise Clause mandates that "a law that is neutral and of
general applicability need not be justified by a compelling
governmental interest even if the law has the incidental

---

[13] It goes without saying that Plaintiff may hold whatever
*personal* religious beliefs she wishes. Indeed, Dr. Anderson-Wiley
testified at the hearing that someone with Plaintiff's personal
religious beliefs may successfully graduate form ASU's counseling
program. Moreover, Dr. Schenck testified that students sharing
religious beliefs similar to those of Plaintiff have, in fact,
successfully completed the Counselor Education degree program at ASU.
But this freedom to choose one's religious beliefs must be separated
from a student's ability to adhere to professional ethical rules that
form a portion of the student's academic curriculum.

effect of burdening a particular religious practice." First Vagabonds Church of God v. City of Orlando, 610 F.3d 1274, 1285 (11th Cir. 2010) (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993)). Such a law need only have a rational basis, and is presumed to be constitutional. First Vagabonds Church of God, 610 F.3d at 1285. The Supreme Court has recently reaffirmed this standard, stating "that the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." Martinez, 130 S. Ct. at 2995 n.27 (citing Smith, 494 U.S. at 878-82).

The district court applied this standard in Ward. There, EMU's curricular requirement that counseling students follow the ACA Code of Ethics was deemed generally applicable. 2010 WL 3026428 at *17. Likewise, ASU's same curricular requirement is generally applicable and applies equally to all students enrolled in the program, regardless of religion. Moreover, Plaintiff has not established that ASU's requirement is aimed at particular religious practices, and Plaintiff has not established that there is a system of "particularized exemptions" by which students enrolled in ASU's program would be allowed to deviate from the ACA Code of Ethics, and still graduate. For these

reasons, Plaintiff has not established that she is substantially likely to succeed on the merits of her Free Exercise claim.

### C. First Amendment Retaliation

Plaintiff also claims to have been retaliated against for exercising her First Amendment freedoms. To establish a claim in this context, a plaintiff "must establish first, that [her] speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).

Plaintiff's refusal to complete the Remediation Plan and her unwillingness to adhere to the ACA Code of Ethics constitute a refusal to complete curriculum requirements. Defendants' reasons for imposing the Remediation Plan appear to be, on the evidence presented, academically legitimate, rather than a mere pretext to retaliate against her for expressing her beliefs. Plaintiff points to no instance in which she was asked to change her personally-held religious beliefs. To the contrary, the record reveals that Plaintiff was asked only to complete the Plan in order

to fulfill academic requirements "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273. Plaintiff has thus failed to establish a substantial likelihood of success on the merits of her First Amendment retaliation claim.

## IV. Conclusion

Because the Court finds that Plaintiff has not clearly carried her high burden in establishing a substantial likelihood of success on the merits of her lawsuit, discussion of the remaining three elements under the preliminary injunction analysis is not necessary. Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).

Upon the foregoing, Plaintiff's motion for preliminary injunction (doc. no. 3) is **DENIED.**

**ORDER ENTERED** at Augusta, Georgia, this _20th_ day of August, 2010.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA